# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530

*Plaintiff,*

v.

S&P GLOBAL INC.
55 Water Street
New York, NY 10041

and

IHS MARKIT LTD.
4th Floor, Ropemaker Place
25 Ropemaker Street
London, United Kingdom
EC2Y 9LY

*Defendants.*

## **COMPLAINT**

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action against S&P Global Inc. ("S&P") and IHS Markit Ltd. ("IHSM") to enjoin S&P's proposed merger with IHSM, to enjoin anticompetitive conduct by IHSM, and to obtain other equitable relief. The United States complains and alleges as follows:

I.      **INTRODUCTON**

1.      On November 30, 2020, S&P and IHSM announced a merger to combine in an all-stock transaction that values IHSM at approximately $44 billion.  S&P and IHSM are both financial and commodity information conglomerates, providing market data, indices, news, and analytical tools to participants in various financial and commodity markets around the world.

2.      S&P and IHSM operate two of the four global price reporting agencies ("PRAs") and two of the three leading PRAs in the United States.  S&P provides PRA services through its Platts division ("Platts"), while IHSM offers PRA services primarily through its Oil Price Information Services ("OPIS"), Coal, Metals, and Mining ("CMM"), and PetrochemWire ("PCW") businesses.

3.      PRAs provide price assessments, news, and analysis related to numerous commodity markets around the world.  PRAs sell their services to commodity industry participants (e.g., oil refiners, commodities traders, large fuel consumers like airlines), that use the information to inform supply and demand decisions, as a reference for price terms in supply contracts, and as the basis for settling hedging instruments like futures contracts.

4.      Competition between S&P's Platts division and IHSM's OPIS, CMM, and PCW businesses has resulted in lower prices and increased quality and innovation for PRA customers.  The proposed merger would eliminate this significant competition in markets that are already highly concentrated.

5.      Accordingly, the proposed merger is likely to lessen competition substantially in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

6.      Separately, in 2016, IHSM's OPIS division entered into a 20-year exclusive data license and non-compete agreement (the "Data License") with a third-party data provider,

GasBuddy LLC ("GasBuddy"), that operates a popular crowd-sourced retail gas price information app and has long provided OPIS with pricing data for resale to commercial customers (e.g., retail gas station operators).  This non-compete has effectively prevented and continues to prevent GasBuddy—a company well positioned to enter the retail gas price data market—from launching a data service that would compete with OPIS.

7.      Accordingly, the Data License unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.      PARTIES TO THE PROPOSED MERGER AND THE DATA LICENSE

8.      S&P is a New York corporation headquartered in New York, New York.  S&P is comprised of four business divisions: S&P Global Ratings, S&P Global Market Intelligence, S&P Dow Jones Indices, and S&P Platts.  It reported global 2020 revenues of $7.44 billion.

9.      S&P Platts, which offers PRA services, among other products and services, accounts for roughly 12% of S&P's revenue, reporting global 2020 revenues of $878 million.

10.      IHSM is a Bermuda corporation headquartered in London, England.  IHSM is comprised of four business divisions: Financials Services, Transportation, Consolidated Markets & Solutions, and Resources.  It reported global 2020 revenues of $4.29 billion.

11.      IHSM provides PRA services primarily through its OPIS, CMM, and PCW businesses, which are housed within IHSM's Resources division.  OPIS, CMM, and PCW reported global 2020 revenues of approximately $140 million.

12.      GasBuddy is a Delaware limited liability company that provides a crowd-sourced retail gas price information app.  From 2013 until 2021, GasBuddy was owned by UCG Holdings LP ("UCG").  In early 2021, UCG sold GasBuddy to Professional Datasolutions, Inc.

### III.   JURISDICTION AND VENUE

13.     The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, and Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, and to prevent and restrain Defendant IHSM from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.     Defendants are engaged in, and their activities substantially affect, interstate commerce.  Defendants both offer commodity price assessments, news, and analysis throughout the United States.  This Court therefore has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

15.     Defendants have each consented to personal jurisdiction and venue in this jurisdiction for purposes of this action.  Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) and (c).

### IV.   INDUSTRY BACKGROUND

16.     PRAs provide commodity price assessments, news, and analysis that are critical to the proper functioning of numerous commodity markets.  Some commodities, like corn or wheat, are traded on exchanges, which make price information readily accessible.  But for many commodities—including many energy commodities like refined petroleum products (e.g., gasoline and jet fuel), coal, and petrochemicals—trading is done off-exchange in private transactions with no reporting obligations.  It is in these opaque markets where PRA price assessments are used as a proxy for the prevailing market price.

17.     To produce these price assessments, PRAs collect information from commodity suppliers and participants in commodities transactions and then apply proprietary methodologies

and editorial judgment.  PRAs focus on providing daily price assessments, and often make the assessments available to subscribers via a data feed.

18.     In most cases, PRAs assess prices at a given time for a specific commodity at a specific geographic location (e.g., jet fuel in Los Angeles).  In addition, most PRAs focus on assessing prices for spot (or bulk) transactions, which happen at the top of the supply chain (e.g., at the refinery gate where the commodity is created).  Some PRAs—like OPIS—also sell information regarding commodity prices down the supply chain at the wholesale (referred to as "rack" in the industry) and retail levels.  In contrast to spot-level PRA services, however, collecting rack and retail prices does not involve any "assessment."  Rack and retail prices are posted and PRAs simply collect these posted (or charged) prices from market participants, or through third party aggregators, and then combine and offer the data to end customers.  For example, retail gas station prices are knowable and the collection thereof does not require further assessment because gas stations advertise their prices for passing motorists.

19.     PRA customers are located worldwide and span a wide range of industries.  While major oil and gas companies, commodities traders, and large energy consumers generate the majority of PRA revenues, there are many smaller customers that participate in, or are affected by, commodity markets.

## V.     RELEVANT MARKETS RELATED TO THE PROPOSED MERGER

### A.     Relevant Product Markets

20.     S&P, through its Platts division, and IHSM, through its OPIS, CMM, and PCW businesses, both provide PRA services for refined petroleum products (e.g., gasoline and jet fuel), coal, and petrochemicals.  More specifically, both companies provide spot-level price assessments, and related news and analysis, for dozens of the same types of refined petroleum

products, coal, and petrochemicals, across dozens of the same geographic locations across the United States and the world.

21.     PRA services for any particular type of refined petroleum product, coal, or petrochemical are not a reasonable substitute for PRA services for any other type of refined petroleum product, coal, or petrochemical.  Similarly, PRA services for a particular commodity at one geographic location are not a reasonable substitute for PRA services for the same commodity at a different geographic location.  For example, the spot price of jet fuel in Los Angeles is not a reasonable substitute for a customer seeking the spot price of jet fuel in New York.

22.     Despite the lack of substitutability between PRA services for different commodities, or for the same commodity at different geographic locations, spot-level PRA services for U.S.-located (i) refined petroleum products, (ii) coal, and (iii) petrochemicals can be analyzed in the aggregate because each is offered under similar competitive conditions.

23.     Therefore, spot-level PRA services for U.S.-located refined petroleum products, coal, and petrochemicals are each lines of commerce, or relevant product markets, for the purposes of analyzing the effects of the proposed merger under Section 7 of the Clayton Act, Clayton Act, 15 U.S.C. § 18.

**B.     Relevant Geographic Market**

24.     Commodity market participants looking for spot-level PRA services for U.S.-located refined petroleum products, coal, or petrochemicals cannot reasonably turn to a PRA without significant U.S. operations and an established reputation for accurately reporting commodity prices and developments.  To gather the trading details and market intelligence necessary to provide PRA services that customers can trust to reflect current trading conditions,

6

PRAs must have a large number of U.S.-based analysts (referred to as "price reporters" in the industry) with close connections to the relevant players, and a detailed understanding of supply and demand dynamics, in the major U.S. trading hubs.  In addition, PRA customers value established PRA providers that have a proven track record of accurately covering a given U.S. commodity market.

25.     A hypothetical monopolist of spot-level PRA services for refined petroleum products, coal, or petrochemicals in the United States could profitably impose a small but significant non-transitory increase in price for its services without losing sufficient sales to render the price increase unprofitable.  Accordingly, spot-level PRA services for refined petroleum products, coal, or petrochemicals in the United States is a relevant market for the purposes of analyzing the effects of the proposed merger under Section 7 of the Clayton Act, Clayton Act, 15 U.S.C. § 18.

## VI.   S&P'S PROPOSED MERGER WITH IHSM IS LIKELY TO RESULT IN ANTICOMPETITIVE EFFECTS

26.     Today, S&P and IHSM compete vigorously in each of the relevant markets, resulting in lower prices and increased quality and innovation for PRA customers.

27.     In each of the relevant markets, S&P and IHSM are two of a very small number of companies providing PRA services.  In spot-level PRA services for both refined petroleum products and coal in the United States, S&P and IHSM are two of the three companies that generate the vast majority of revenues in the two markets.  And in spot-level PRA services for petrochemicals in the United States, S&P and IHSM are two of the four companies that generate the vast majority of revenues.

28.     For many price assessments (e.g., the spot price for jet fuel in Los Angeles), one PRA will become the market standard, or benchmark, after an initial period where PRAs vie for

market adoption.  Once market adoption occurs, that PRA's price assessment becomes embedded in the market ecosystem, as it is frequently referenced in price indexation formulas in supply contracts and in the relevant derivative contracts traded on major derivatives exchanges that are used by market participants to hedge their positions.

29.    Competition among PRAs plays out in various forms.  As referenced above, PRAs initially vie to become the benchmark price assessment for many commodities.  Because benchmark price assessments can generate substantial subscription revenues, PRAs compete fiercely on price, quality, and innovation dimensions to gain benchmark status.  And given the ongoing energy transition to more renewable energy sources like biofuels, there are likely to be many new benchmark opportunities in the near future.  Established PRAs—like those operated by S&P and IHSM—are often best placed to compete for new benchmark opportunities.

30.    Even after one PRA has been chosen as the benchmark, substantial competition remains between the PRAs covering that commodity, including competition (i) among the non-benchmark PRAs to serve as a secondary source for many customers, who use the secondary source as a "second look" to check the accuracy of the benchmark provider, and (ii) between the secondary source and the benchmark provider along both price and quality dimensions, resulting from the disciplining effect of this second-look, accuracy check.

31.    While it is rare, some commodity markets have switched their benchmark from one PRA to another because of price and/or quality concerns.  So, as one industry observer put it, "[d]espite the enormous difficulties of displacing an incumbent and the extreme rarity of switches, rival PRAs have to nonetheless invest heavily in marketing and in business development staff in order to be considered as a credible alternative during those rare moments

when the incumbent stumbles."[1]

32.     By eliminating the substantial head-to-head competition that exists today between S&P and IHSM, the proposed merger would result in higher prices and decreased quality and innovation for PRA customers.  Accordingly, the proposed merger likely would substantially lessen competition in spot-level PRA services for refined petroleum products, coal, and petrochemicals in the United States.

## VII.    ABSENCE OF COUNTERVAILING FACTORS RELATED TO THE PROPOSED MERGER

33.     Entry into spot-level PRA services for refined petroleum products, coal, or petrochemicals in the United States is unlikely to be timely, likely, or sufficient to prevent the proposed merger's anticompetitive effects.  As S&P and IHSM executives have recognized, barriers to entry into spot-level PRA services for refined petroleum products, coal, or petrochemicals in the United States are high.  These barriers to entry include (i) the large sunk costs and significant other expenditures necessary to begin providing commodity price assessments, news, and analysis; (ii) significant time and expense to build a reputation for accurately covering commodity markets; and (iii) the difficulty of displacing a benchmark PRA provider once that PRA's price assessment becomes the benchmark and gets embedded in supply and derivative contracts.  Unsurprisingly given all of these barriers, no significant PRA has entered in over 20 years.

34.     The proposed merger is unlikely to generate verifiable, merger-specific efficiencies sufficient to reverse or outweigh the anticompetitive effects that are likely to occur.

## VIII.   THE DATA LICENSE IS AN UNREASONABLE RESTRAINT OF TRADE

35.     As noted above, in addition to offering spot-level PRA services, OPIS also

---

[1] Owain Johnson, The Price Reporters: A Guide to PRAs and Commodity Benchmarks (Routledge 2018) at 34.

collects and resells information related to retail gas prices, largely in the United States.  Since 2009, GasBuddy has been one of OPIS's two main sources of retail gas price data.

36.     OPIS resells these data to customers like retail gas station operators or oil refiners, that use the data for competitive benchmarking and to inform supply and demand decisions.

37.     In 2012, OPIS learned that "GasBuddy [saw] a big opportunity in pursuing data sales," and GasBuddy notified OPIS in "October [2012] that they [would] cease providing retail prices to [OPIS] effective Jan. 1 [2013]."  OPIS saw GasBuddy's plan as a significant threat to its retail gas price information business because it would greatly reduce the number of real-time gas prices that OPIS could provide, and it would also "greatly intensify competition in the retail pricing space."  In response, OPIS made a "tactical plan" to "buy[] GasBuddy" to thwart this potential competition.

38.     In March 2013, UCG—OPIS's then-owner—followed through with this plan and bought GasBuddy in a transaction that was below the reportability thresholds of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a.

39.     In 2016, UCG sold OPIS to IHSM, but retained its ownership of GasBuddy.  In order to maximize the value of OPIS and prevent GasBuddy from competing with OPIS under IHSM's ownership, UCG had OPIS and GasBuddy enter into the Data License, which (1) gave OPIS exclusive, worldwide rights to GasBuddy's data for 20 years; (2) required OPIS to pay no licensing fees for the data; and (3) subjected GasBuddy to a non-compete provision that restrained it from competing with OPIS or any other firm in the sale of retail gas price data to commercial customers.  OPIS summarized the Data License simply as a "long-term agreement where we are the sole distributor of GasBuddy data and they can't even sell it themselves."

40.     Retail gas price data providers compete to serve commercial customers on both

price and quality, and the Data License has prevented—and continues to prevent—GasBuddy from launching a competing retail gas price data service.  But for the non-compete agreement, GasBuddy would be free to enter the retail gas price data market and compete with OPIS.  The non-compete provision imposed on GasBuddy is a horizontal restraint that stifles competition. The Data License, therefore, has resulted, and continues to result, in higher prices and lower quality in the retail gas price data market.

41.     Furthermore, the non-compete provision imposed on GasBuddy was not reasonably necessary to a separate, legitimate transaction or collaboration.  For example, the 20-year term of the non-compete was overbroad in its duration.  That is, the noncompete was longer than necessary to effectuate and transfer any intellectual property, goodwill, or customer relationships associated with UCG's 2016 sale of OPIS.  Nothing about IHSM's 2016 acquisition of OPIS justified a ban on competition between GasBuddy and OPIS until 2036.  To the contrary, the non-compete simply inflated the value of OPIS and now protects only IHSM's desire to be free from competition in the market for the sale of retail gas price data.

42.     The Data License, therefore, unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## IX.    VIOLATIONS ALLEGED

### Count One

### Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18

43.     The United States hereby incorporates the allegations of paragraphs 1 through 42 above as if set forth fully herein.

44.     S&P and IHSM are hereby named defendants on Count One of this Complaint.

45.     S&P's proposed merger with IHSM is likely to substantially lessen competition in

the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

46.     Unless enjoined, the proposed merger would likely have the following anticompetitive effects, among others, in the relevant markets:

(a)     eliminate present and future competition between S&P and IHSM;

(b)     competition generally will be substantially lessened; and

(c)     prices will likely increase and quality and innovation will likely decrease.

## Count Two

## Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

47.     The United States hereby incorporates the allegations of paragraphs 1 through 42 above as if set forth fully herein.

48.     IHSM is hereby named as the defendant on Count Two of this Complaint.

49.     Beginning at least as early as 2016, and continuing to this day, IHSM's subsidiary OPIS has engaged in a contract, the Data License, with GasBuddy that unreasonably restrains trade to OPIS's benefit, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

50.     Unless enjoined, the contract would likely continue to have the following anticompetitive effects, among others:

(a)     eliminate future competition between OPIS and GasBuddy for the sale of retail gas price information; and

(b)     cause prices for retail gas price information to be higher than they would otherwise be and reduce the levels of quality, service, and innovation below what they would be absent the agreement.

## X.     REQUEST FOR RELIEF

51.     The United States requests that the Court:

12

(a)    adjudge and decree S&P's proposed merger with IHSM to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)    adjudge and decree that the Data License is a contract in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c)    permanently enjoin Defendants from consummating S&P's proposed merger with IHSM or from entering into or carrying out any other agreement, understanding, or plan by which the assets or businesses of S&P and IHSM would be combined;

(d)    permanently enjoin Defendant IHSM from enforcing the non-compete contained in the Data License;

(e)    award the United States its costs of this action; and

(f)    grant the United States such other relief the Court deems just and proper.

Dated: November 12, 2021

Respectfully Submitted,

_____/s/ Richard A. Powers_____
RICHARD A. POWERS
Acting Assistant Attorney General
Antitrust Division


_____/s/ Kathleen S. O'Neill_____
KATHLEEN S. O'NEILL
Senior Director of Investigations
and Litigation


_____/s/ Owen M. Kendler_____
OWEN M. KENDLER
Chief
Financial Services, Fintech, and Banking
Section


_____/s/ Lisa A. Scanlon_____
LISA A. SCANLON
Assistant Chief
Financial Services, Fintech, and Banking
Section

_____/s/ Travis R. Chapman_____
TRAVIS R. CHAPMAN*
VITTORIO COTTAFAVI
COLLIER KELLEY
RACHEL ZWOLINSKI
Trial Attorneys
Financial Services, Fintech, and Banking
Section
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 353-9006
Email: travis.chapman@usdoj.gov

*LEAD ATTORNEY TO BE NOTICED